**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-1052-WJM-KLM

EDWARD AND LISA MCCAFFREY,

    Plaintiffs,

v.

GREAT NORTHERN INSURANCE COMPANY,

    Defendant.

**ORDER GRANTING PLAINTIFFS' MOTION TO VACATE APPRAISAL DECISION**

Plaintiffs Edward and Lisa McCaffrey (jointly, "Plaintiffs") bring this insurance action against Defendant Great Northern Insurance Company, arguing that Defendant breached its insurance contract with Plaintiffs and has denied payments of covered benefits in bad faith. (ECF No. 45.)

Before the Court is Plaintiffs' Motion to Vacate Appraisal Decision ("Motion"), filed on June 5, 2020. (ECF No. 22.) For the reasons explained below, the Motion is granted.

## I. BACKGROUND

### A. Factual Allegations[1]

Plaintiffs purchased a Masterpiece home insurance policy from Defendant,

---

[1] The following factual summary is based on the parties' briefs on the Motion and documents submitted in support thereof. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

1

Police No. 12178085-01 (the "Policy"), effective June 29, 2015 through June 29, 2016. (ECF No. 22-1 at 4.)  The Policy provides coverage against physical loss if Plaintiffs' home or contents are damaged, destroyed, or lost.  (*Id.* at 28.)

In December 2015, Plaintiffs began a home renovation project which included installation of a pergola adjacent to their kitchen.  (ECF No. 22 at 2.)  After the contractor advised Plaintiffs of potential water damage, Plaintiffs made a claim under the Policy.

1. Defendant's Investigation

On December 30, 2015, Defendant sent a reservation of rights letter to Plaintiffs, stating

> The claim involves water intrusion with possible rotting of wall framing and/or mold growth behind the stucco on the rear elevation as well as possibly other areas of your home. We are investigating the cause of the damage to this area. Until such time that we are able to verify the cause of the loss, we are unable to determine whether your claim is covered by your insurance policy.  We expect the investigation by an engineer with Western Engineering and Research Corp. ["Western Engineering"] to assist with making this determination.
>
> Certain provisions under the Policy may exclude coverage for losses of this nature.  The following exclusions under your insurance policy may apply to your loss: Gradual or sudden loss, Fungi and mold, and/or Faulty planning, construction or maintenance.

(ECF. No. 31-1 at 1.)

Defendant retained Western Engineering to determine the cause of the water damage.  (ECF No. 31 at 2.)  On January 12, 2016, Defendant's representative and a Western Engineering representative inspected Plaintiffs' home and observed "interior

2

damage that is likely a result of water penetrating through exterior cladding and effecting interior finishes." (ECF No. 22-2 at 1.) During the inspection, Western Engineering observed certain construction deficiencies and deterioration of building materials from the home's original construction. (ECF No. 31-3.) It recommended that Defendant undertake intrusive testing of the exterior stucco of Plaintiffs' home to quantify the amount of damage. (*Id.* at 6–7.) Defendant confirmed that it would "repair damage caused by [the] intrusive testing." (ECF No. 22-3 at 1.)

On March 2 and 14, 2016, Defendant's engineers conducted the intrusive testing of Plaintiffs' home by "making cuts through the hardcoat stucco cladding at approximately 31 locations on each elevation of [Plaintiffs'] home." (ECF No. 22 at 3.) Thereafter, Western Engineering issued a supplemental report detailing its observations from the intrusive testing. (ECF No. 31-4.)

### 2. Repair Estimates & Payment of Claim

Defendant retained Madsen Kneppers and Associates ("MKA") to help Defendant estimate of the cost to repair the damages to Plaintiffs' home. (ECF No. 31 at 2.) MKA generated two repair estimates for Plaintiffs' home. The first estimate, dated March 1, 2016, estimated that it would cost $374,450.56 to repair Plaintiffs' home. (ECF No. 22-4 at 2.) The second estimate, dated April 12, 2016, estimated that the repairs would cost $136,147.63. (ECF No. 22-5.)

On April 18, 2016, Defendant provided payment of $136,147.63 to Plaintiffs "to pay for costs to repair covered damage and to restore areas of your home opened up during the investigation." (ECF No. 22-6 at 1.) In particular, Defendant represented that

3

it "agrees the interior water damage in the two bedrooms which ensued from the construction defects is covered under the Policy," as well as "the costs to restore areas opened up during the intrusive investigation." (*Id.* at 3.) However, Defendant invoked numerous exemptions to the Policy, including the "faulty planning, construction or maintenance" exclusion, the "gradual or sudden loss exclusion," and a "fungi mold" exclusion. (*Id.*)

Thereafter, the parties continued to disagree about Defendant's coverage determination and the proper amount of Plaintiffs' loss. (ECF No. 22 at 3–4.) Nonetheless, Defendant stood by its previous coverage determinations. (*Id.* at 4.)

3. Appraisal

On August 6, 2018, Defendant sent Plaintiffs a written demand for appraisal. (ECF No. 22-8.) The Policy states:

> **Appraisals**
>
> **For all coverages except vehicles:**
>
> If you and we fail to agree on the actual cash value or amount of loss, either one can demand that the actual cash value or amount of loss be set by appraisal. If either makes a written demand for appraisal, each party will choose a competent, disinterested appraiser and notify the other of the appraiser's identity within 20 days of the written demand. The two appraisers will choose a competent, disinterested umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state and county (or city if the city is not within the county) where the residence premises is located. The appraisers will separately set the actual cash value or amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the actual cash value and amount of loss. If they fail to agree, they will submit their differences to the umpire. The

4

>umpire will make the award within 30 days after the umpire receives the appraisers' submissions of their differences. A written decision by the umpire will set the amount of loss. However, the maximum amount we will pay for a loss is the applicable amount of coverage even if the amount of the loss is determined to be greater by appraisal.
>
>Each party will:
>
>• pay its own appraiser; and
>• bear the other expenses of the appraisal and umpire equally.
>
>However, we do not waive our rights under this policy by agreeing to an appraisal.

(ECF No. 22-1 at 91.)

Defendant listed the following items that it agreed are subject to, and may be determined by, the appraisal:

>(1) The actual cash value of or amount of loss for alleged damage to the Home, including costs to bring the home to its pre-intrusive testing condition, including appropriate scope of repair and its cost, as discussed in reports of Western Engineering, MKA, Lovell, SBSA, and Wiss Janney Elsner Ass. Inc. ("WJE");
>
>(2) The time needed to repair the alleged damage to the Home, including damage caused by intrusive testing at Plaintiffs' home; and
>
>(3) The reasonable increase in normal living expenses for the Plaintiffs to maintain their usual standard of living during time of repair.

(ECF No. 22-9 at 4.)

Thereafter, the parties hired their own appraisers to determine the cost of repair. Plaintiffs' appraiser estimated the cost to repair Plaintiffs' home as $1,650,814.59 whereas Defendant's appraiser estimated that repairs would cost $136,147.63. (ECF

5

No. 22-12 at 2.)  The parties designated an umpire, James S. Miller (the "Umpire"), who met the parties' appraisers at Plaintiffs' home on June 5, 2017 to inspect the areas of the testing.  (*Id.*)

On October 26, 2019, the Umpire issued his appraisal decision, which, among other things, stated:

> [Defendant] ultimately denied coverage of the water damage itself, claiming that it was the result of the original home design or construction (although it covered certain damages to the interior of the home resulting from the excluded construction / design defects), but agreed to pay for the repair of any damage from the intrusive testing that it had authorized.
>
> . . .
>
> Unfortunately, and due to an inexplicable manner of the [Plaintiffs'] home construction, the exterior walls behind the stucco on the home are in terrible shape.  That condition, however[,] is completely unrelated to the damage caused by the intrusive testing conducted to determine the extent of the damage to the home.  I find and decide that the damage done to the home as a result of the testing can be adequately, and fairly, repaired with the scope of work described by [Defendant's appraiser] and for $254,853.14.  That is the amount suggested by [Defendant's appraiser] as a compromise to include full stucco replacement on the [Plaintiffs'] home, as opposed to simply a new skim coat of stucco as he originally appraised.  I think full stucco replacement is the most appropriate way to best repair the damage resulting [from Western Engineering's] testing.  I agree, however, with [Defendant's appraiser] that the cost of roofing, window, and stone veneer removal should not be included as cost of damage done by the [Western Engineer] testing.

(*Id.* at 2, 4.)

6

**B.      Procedural History**

Plaintiffs filed this action in Douglas County District Court on March 26, 2018, and Defendant removed the action on May 4, 2018.  (ECF Nos. 1, 3.)  Plaintiffs filed the Amended Complaint on July 28, 2020.  (ECF No. 45.)

On June 5, 2020, Plaintiffs filed the Motion.  (ECF No. 22.)  Defendant responded on July 8, 2020 (ECF No. 31), and Plaintiffs replied on July 22, 2020 (ECF No. 35).

On August 14, 2020, United States Magistrate Judge Kristen L. Mix granted a stay of all discovery pending adjudication of the Motion.  (ECF No. 43.)

## II.  LEGAL STANDARDS

An "appraisal award issued under an insurance policy is binding so long as the appraisers (including the umpire) have performed the duties required of them by the policy."  *Andres Trucking Co. v. United Fire & Cas. Co.*, 2018 WL 4496407, at *7 (Colo. App. Sept. 20, 2018).  "As a general matter, an appraisal award entered by an umpire may be disregarded only if the award was made without authority or was made as a result of fraud, accident, or mistake."  *Id.*  Moreover, "legal determinations, including regarding coverage, are clearly outside the scope of the appraisal process."  *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, 100 F. Supp. 3d 1099, 1104 (D. Colo. 2015) (quoting Colo. Rev. Stat. § 13-22-223(1) (requiring court to vacate arbitration award upon finding that "arbitrator exceeded the arbitrator's powers") and 15 Couch on Ins. § 209:8 (3d ed. 2014) ("In an appraisal, the parties refer some ministerial duty or some matter involving only the ascertainment of facts to selected persons for disposition.")); *Gronik v. Balthasar*, 2014 WL 2739333, at *4 (E.D. Wis. June 17, 2014)

(recognizing the Court's job is to determine "whether the [appraiser] understood and carried out the contractually assigned task").

The party challenging an appraisal award bears the burden of demonstrating that the appraised amount should set aside. *Andres Trucking Co.*, 2018 WL 4496407, at *7.

### III.  ANALYSIS

Plaintiffs argue that the Umpire erred by stating that Defendant denied coverage for Plaintiffs' initial water claim and "improperly and unilaterally reduced the scope of the appraisal to a single issue—the cost to repair the damage to the home's exterior caused by [Defendant's] 2016 intrusive testing." (ECF No. 22 at 12–14.)  The Court agrees.

Plaintiffs argue that the scope of the appraisal was to determine: (1) the amount of loss for damage attributable to the intrusive testing; and (2) the amount of loss for the damage to Plaintiffs' home from the water damage claim originally reported to Defendant in December 2015.  (*Id.* at 11.)  Defendant's correspondence supports Plaintiffs' argument regarding the scope of the appraisal.  Defendant's requested that the appraiser determine, among other things, "[t]he actual cash value of or amount of loss for alleged damage to the Home, including costs to bring the home to its pre-intrusive testing condition." (ECF No 22-9 at 4.)  In other words, Defendant requested an appraisal of the total amount of the losses for damage to Plaintiffs' home, which includes not only the intrusive testing costs but also Plaintiffs' other costs (*i.e.*, the costs for Plaintiffs' water damage claim).

Nonetheless, the Umpire limited his loss analysis to *only* the damage caused by the intrusive testing to Plaintiffs' home:

> I find that the damage done to the home as a result of the testing can be adequately, and fairly, repaired with the scope of work described by [Defendant's representative] and for $254,853.14. This is the amount suggested by [Defendant's representative] as a compromise to include full stucco replacement on [Plaintiffs' home]. I think full stucco replacement is the most appropriate way to best repair the damage resulted form [*sic*] the [Westering Engineering] testing.

(ECF No. 22-12 at 3.)

The Umpire offers no explanation, however, for his failure to appraise the amount of the water damage claim, despite the fact that: (1) Defendant has agreed that "the interior water damage in the two bedrooms which ensued from the construction defects is covered under the Policy" (ECF No. 22-6 at 3); and (2) Defendant's own request for appraisal implicitly includes analysis of the water damage claim (*see* ECF No. 22-9 at 4 (demanding appraisal of "[t]he actual cash value of or amount of loss for alleged damage to the Home, including costs to bring the home to its pre-intrusive testing condition")).

Defendant argues that Plaintiffs' contention that the Umpire was obligated to appraise the amount of loss for Plaintiffs' water damage claim "puts the cart before the horse" and "would have the parties pay for an appraisal to set the amount of loss of damages which are the subject of a coverage dispute."[2]  (ECF No. 31 at 13.)  The Court is not persuaded. As an initial matter, Defendant's argument—that an appraiser should not analyze any damages subject to an ongoing coverage dispute—would create the

---

[2] Even if Defendant's position were correct, it still does not explain why the Umpire did not determine the amount of loss resulting from the interior water damage to the two bedrooms, which Defendant agrees is covered under the Policy.  (ECF No. 22-6 at 3.)

9

untenable position where the appraiser is forced to consider the insurer and insured's competing coverage positions prior to issuing an appraisal decision. Under the Policy, the Umpire's role was limited to "set[ting] the actual cash value or amount of loss." (ECF No. 22-1 at 91.) He was not instructed to adjudicate the parties' disputes about whether certain damages are attributable to covered events and only appraise damages relating to those covered events. *See Fisher v. Am. Fam. Mut. Ins. Co.*, 2018 WL 10196066, at *5 (D. Colo. June 14, 2018) ("Nowhere in Colorado law or elsewhere have I found any support for the proposition that an *appraiser* determines what to appraise." (emphasis in original)). Indeed, the disputes regarding coverage determinations are to be resolved by the Court and should not affect the Umpire's analysis.[3] *See Summit Park Townhome Ass'n*, 100 F. Supp. 3d at 1104 ("legal determinations, including regarding coverage, are clearly outside the scope of the appraisal process").

Accordingly, the Court finds that the Umpire's failure to analyze the losses relating to Plaintiffs' water claim improperly reduced the scope of the appraisal decision.[4] As a result, the Umpire's decision must vacated.[5]

---

[3] The Court recognizes that resolution of the parties' coverage disputes may ultimately affect the utility of the Umpire's determination. For this reason, in *Summit Park Townhome Ass'n*, United States District Judge Lewis T. Babcock stated that "[t]he appraisals should separately calculate and identify disputed costs so that the Court can either include them or exclude them once it has determined whether the policy provides coverage for them . . . Following this course will enable the parties to avoid unnecessary discovery or additional appraisals." 100 F. Supp. 3d at 1104.

[4] Because the Court vacates the Appraisal Decision on this basis, the Court need not analyze Plaintiffs' other arguments.

[5] Defendant argues that, in the event the Court concludes that the appraisal decision was erroneous, the appropriate remedy is to remand this issue to the appraisal panel, not

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Plaintiffs' Motion to Vacate Appraisal Decision (ECF No. 22) is GRANTED;

2. The stay on discovery pending completion of the appraisal proceeding (ECF No. 17) is LIFTED;

3. The parties are DIRECTED to jointly contact Magistrate Judge Kristen L. Mix's chambers by no later than **February 2, 2021** to set a Status Conference, or such other proceeding as Judge Mix deems appropriate to move this action forward.

Dated this 29th day of January, 2021.

BY THE COURT:

_____
William J. Martinez
United States District Judge

---

vacate the award.  (ECF No. 31 at 14.)  However, the Tenth Circuit has held that "neither party may require a second appraisal where the first fails without his fault.  *Norwich Union Fire Ins. Soc'y v. Cohn*, 68 F.2d 42, 44 (10th Cir. 1933).  Instead, the parties' dispute simply moves to the courts as if no appraisal had been demanded in the first place.  *Id.*; *see also Copper Oaks Master Home Owners Ass'n v. Am. Family Mut. Ins. Co.*, 416 F. Supp. 3d 1115, 1128 (D. Colo. 2019) (recognizing that neither side is obligated to proceed with a second appraisal after the initial appraisal was vacated).